# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

UP TO $5,500 IN FUNDS FROM CASHIER'S CHECK NUMBER 2072536345 DRAWN ON U.S. BANK ACCOUNT ENDING IN 5230

Case Number: 19-MJ-1355

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, John Milotzky, being duly sworn depose and say:

I am a Detective and Task Force Agent assigned to the United States Secret Service Milwaukee Resident Office Financial Crimes Task Force, and have reason to believe that in the Eastern District of Wisconsin there is now certain property, namely, up to $5,500 in funds from cashier's check number 2072536345 drawn on U.S. Bank account ending in 5230 that is civilly forfeitable under 18 U.S.C. §§ 981(a)(1)(A) and (C) and 984, including cross-references in § 981(a)(1)(C) to 18 U.S.C. §§ 1956(c)(7) and 1961(1), and criminally forfeitable under 18 U.S.C. §§ 982(a)(1) and 981(a)(1)(C) in conjunction with 28 U.S.C. § 2461(c), as property that is derived from proceeds traceable to specified unlawful activity, namely, wire fraud in violation of 18 U.S.C. § 1343, and as property involved in concealment money laundering in violation of 18 U.S.C. § 1956, and which property is therefore also subject to seizure for purposes of civil forfeiture under 18 U.S.C. § 981(b)(2) and for purposes of criminal forfeiture under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

The application is based on these facts:

&check; Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days:_____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Signature of Affiant
John Milotzky, USSS

Sworn to before me, and subscribed in my presence

10/22/19 @ 2:00 p.m.
Date and time issued

at Milwaukee, Wisconsin
City and State

William E. Duffin, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

# AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEIZURE WARRANTS

I, John Milotzky, have been duly sworn on oath, state as follows:

## Affiant's Background

1. I am a Detective with the City of Wauwatosa Police Department and have been employed with that department since 2001. I am currently assigned to the United States Secret Service Milwaukee Resident Office Financial Crimes Task Force ("MFCTF"). I was federally deputized on June 24, 2015. My duties as a Detective and Task Force Agent with the Secret Service include investigating financial crimes, such as identity fraud, check fraud, credit card fraud, bank fraud, wire fraud, currency-counterfeiting offenses, and money laundering. During my employment with the Wauwatosa Police Department and the MFCTF, I have conducted several investigations that have resulted in seizures of criminally derived property, including monetary instruments and United States currency.

2. As a Detective and Task Force Agent, I have conducted investigations into wire fraud, money laundering, and other complex financial crimes. In the course of those investigations, I have used various investigative techniques, including conducting undercover operations, reviewing physical and electronic evidence, obtaining and reviewing financial records, and working with cooperating sources of information. In the course of those investigations, I have also become familiar with techniques that criminals use to conceal the nature, source, location, ownership, and control of proceeds of crime and to avoid detection by law enforcement of their underlying acts and money laundering activities.

3. Because I am submitting this affidavit for the limited purpose of establishing probable cause for the requested seizure warrants, I have not included in this affidavit every detail I know about this investigation. Rather, I have included only the information necessary to establish probable cause for the requested seizure warrants.

4. The facts set forth in this affidavit are based on my personal knowledge, including what I have learned through my training and experience as a law enforcement officer, my review of documents and other records obtained in the course of this investigation, and information I have obtained from other investigators, all of whom I believe to be truthful and reliable, in the course of investigating this incident.

## Property Sought to be Seized

5. I submit this affidavit in support of an application for warrants to seize the up to $56,982 in total funds, from four cashier's checks and an amount of seized currency, as follows:

   a. Up to $27,000.00 in funds from Cashier's Check number 1302104870 drawn on Bank of America account ending 4142, which was funded on September 12, 2019, by a transfer of funds from Bank of America account ending in 1679 ("CASHIER'S CHECK 1"), currently being held as evidence at the Wauwatosa Police Department under inventory number 19-3797-12;

b. Up to $6,700.00 in funds from Cashier's Check number 1663110728 drawn on Bank of America account ending 4142, which was funded on September 12, 2019, by a transfer of funds from Bank of America account ending in 1679 ("CASHIER'S CHECK 2"), currently being held as evidence at the Wauwatosa Police Department under inventory number 19-3797-13;

c. Up to $5,500.00 in funds from Cashier's Check number 2072536345 drawn on U.S. Bank account ending in 5230, which was funded on September 12, 2019, by a transfer of funds from U.S. Bank account ending in 0119 ("CASHIER'S CHECK 3"), currently being held as evidence at the Wauwatosa Police Department under inventory number 19-3797-10;

d. Up to $5,500.00 in funds from Cashier's Check number 2072536344 drawn on U.S. Bank account ending in 5230, which was funded on September 12, 2019, by a transfer of funds from U.S. Bank account ending in 0119 ("CASHIER'S CHECK 4"), currently being held as evidence at the Wauwatosa Police Department under inventory number 19-3797-11; and

e. $12,282.00 in United States currency (the "$12,282"), currently being held as evidence at the Wauwatosa Police Department under inventory numbers 19-3797-7, 19-3797-8, and 19-3797-9.

6. For the reasons set forth below, I submit that there exists probable cause to believe that the funds used to purchase the four above-described cashier's checks, and the $12,282 in currency, are:

a. Funds traceable to, and therefore proceeds of, a wire fraud offense or offenses committed in violation of 18 U.S.C. § 1343;

b. Funds involved in concealment money laundering committed in violation of 18 U.S.C. § 1956;

c. Subject to civil forfeiture under 18 U.S.C. §§ 981(a)(1)(A) and (C) and 984, including cross-references in § 981(a)(1)(C) to 18 U.S.C. §§ 1956(c)(7) and 1961(1);

d. Subject to criminal forfeiture under 18 U.S.C. §§ 982(a)(1) and 981(a)(1)(C) and 28 U.S.C. § 2461(c); and

e. Subject to seizure via a civil seizure warrant under 18 U.S.C. § 981(b)(2) and via a criminal seizure warrant under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

## FACTS SUPPORTING FINDINGS OF PROBABLE CAUSE FOR ISSUANCE OF SEIZURE WARRANTS

### Common attributes of Business Email Compromise fraud and romance fraud schemes

7. One common financial fraud scheme is known as a Business Email Compromise ("BEC") fraud scheme. In a BEC scheme, a fraudster gains unauthorized access to, or spoofs, the email address belonging to a customer or vendor of a business. The fraudster then sends an electronic communication—on the false pretense that the fraudster is the business's legitimate vendor or customer—instructing the business or one or more of its vendors, customers, or financial institutions to wire money to a bank account controlled by the fraudster.

8. In many cases, the person or persons who launder the proceeds of a BEC fraud scheme first open a bank account or accounts to receive those proceeds. Such a launderer often opens the bank account or accounts in the name of one or more fictitious businesses in order to conceal the fraudulent nature of the bank account from the bank and the victims who are duped into wiring money there.

9. Perpetrators of BEC fraud schemes sometimes also recruit witting or unwitting persons within the United States to open bank accounts that the perpetrators use to receive proceeds of the scam. The perpetrators often target persons who are seeking companionship, or are otherwise mentally or emotionally vulnerable, to open such accounts at financial institutions. Sometimes those accounts are opened by a victim of a romance or celebrity fraud scam or both. Through such a romance fraud scam, the romance fraud victim is duped into opening the account on the belief that the victim will be using the account to receive legitimate money from a purported romantic interest, when in fact that victim will be using the account to receive BEC fraud proceeds from someone who has no particular romantic interest in the victim. Romance fraud victims are also duped into sending BEC fraud proceeds, and sometimes the victim's own money, to the fraudster on false pretenses.

10. In a celebrity fraud scam, a fraudster uses electronic messages to delude the victim into believing that the victim is corresponding with the celebrity the fraudster purports to be. The fraudster then dupes the victim to receive fraud proceeds from the fraudster, and to send fraud proceeds and sometimes the victims' own money to the fraudster, on false pretenses.

11. Not all such third-party account holders who receive BEC proceeds are romance fraud or celebrity fraud victims who are ignorant, at least initially, as to the nature of the BEC fraud proceeds being deposited into their accounts. Some persons who open and use accounts to receive BEC fraud proceeds are witting money mules who understand the criminal nature of the funds they are receiving in the account from the outset. Other such account holders are put on notice of the facts that they are receiving, and helping launder, fraud proceeds during the course of receiving such fraud proceeds into their account. Thus, some persons who launder BEC fraud proceeds might begin as unwitting money mules but then progress to becoming witting money launderers.

**Summary of conspiracy to receive and launder proceeds of Business Email Compromise fraud scheme**

12. Based on the facts set forth below, I submit that Antoine Maclin and William Newman conspired (a) to receive proceeds of one or more Business Email Compromise ("BEC") fraud schemes and (b) to launder those proceeds through various bank accounts, including two bank accounts that Maclin opened in the name of a nominee business, and one account held in the name of S.S., who appears to be the victim of a romance and celebrity fraud scheme.

13. Antoine Maclin's currently known role in the conspiracy was to open two bank accounts in the name of a fictitious business, "Reach Back LLC," and to use those accounts to launder BEC fraud proceeds through those accounts while knowing that those fraud proceeds were proceeds of some form of criminal activity and for the purpose of concealing the nature, source, location, ownership, and control of those criminal proceeds.

14. William Newman's currently known role in the conspiracy was to assist Maclin in the laundering and transporting BEC fraud proceeds, while knowing that those fraud proceeds were proceeds of some form of criminal activity and for the purpose of concealing the nature, source, location, ownership, and control of those criminal proceeds.

15. In furtherance of these conspiracies to receive and launder proceeds of a BEC fraud scheme or schemes, Maclin opened two bank accounts. Maclin opened both accounts in both his own name as well as the name of a nominee business, "Reach Back LLC."

16. Reach Back LLC appears to be bogus entity that serves no legitimate purpose. A Google search of "Reach Back LLC Milwaukee" yields no hits to any business of that name. In addition, as set forth below, after opening those two bank accounts, Maclin and Newman used the accounts to do nothing but receive BEC fraud proceeds.

17. Maclin opened one of those accounts, which ended in 1679, at Bank of America ("BOA 1679"). Two of the cashier's sought be seized, "Cashier's Check 1" and "Cashier's Check 2," as defined below, were purchased with a portion of the $99,694.58 in BEC fraud proceeds that were transferred into—and laundered through—BOA 1679.

18. Maclin opened the other account, which ended in 0119, at U.S. Bank ("USB 0119"). The other two cashier's checks sought be seized, "Cashier's Check 3" and "Cashier's Check 4" as defined below, were purchased with a portion of the $18,837.63 in BEC fraud scheme proceeds that were transferred into—and laundered through—through USB 0119.

19. The $12,282 in United States currency, which the Wauwatosa Police Department seized from Newman on September 12, 2019, as evidence, appears to be traceable almost entirely to two cash withdrawals, totaling $12,000, traceable entirely to BEC fraud proceeds, that Maclin and Newman had made earlier that same day from BOA 1679, at Bank of America branches in McHenry, Illinois, and Waukegan, Illinois. Accordingly, the United States now

4

seeks to seize that $12,282 in currency, via the requested seizure warrant, for federal asset forfeiture purposes.

20. Attached as Exhibit 1 is a chart that, based on my review of pertinent bank records, fairly and accurately depicts the financial transactions shown on it, including:

    a. The deposit, between September 9 and September 13, 2019, of a total of $118,532.21 in BEC fraud proceeds into BOA 1679 and USB 0119, and

    b. Maclin's and Newman's purchase of the four seized cashier's checks and the withdrawal of more than $19,700 in currency, all on September 12, 2019, and all traceable to proceeds of the BEC fraud proceeds that had been deposited into BOA 1679 and USB 0119.

21. I submit that the four above-referenced cashier's checks, as well as the $12,282 in currency, all of which I seized from Newman during his arrest on unrelated charges on September 12, 2019, are subject to seizure and forfeiture both:

    a. As proceeds of one or more BEC fraud schemes, committed in violation of 18 U.S.C. § 1343 and 2, and

    b. as funds involved in a conspiracy to launder those criminal proceeds through financial transactions that Maclin and Newman engaged in with the intent to conceal the nature, source, location, ownership, and control of those criminal proceeds, in violation of 18 U.S.C. §§ 1956(h) and 1956(a)(1)(B)(i).

**Antoine Maclin's July 25, 2019 registration of "Reach Back LLC"**

22. On July 25, 2019, according to the Wisconsin Department of Financial Institution's website, Maclin registered "Reach Back LLC" with the Wisconsin Department of Financial Institutions. Maclin listed his address, as registered agent, as 333 W. Brown Deer Road, Suite G, Milwaukee, Wisconsin, 53217—which is the address of Pack N Ship, a commercial mail receiving agency ("CMRA"). State of Wisconsin DOT records list Antoine Maclin's address as 9XXX W. Hampton Avenue, Milwaukee, Wisconsin. City of Milwaukee Property Tax records show that in July 2019, Antoine Maclin purchased the property located at 4XXX North 71st Street, Milwaukee, Wisconsin.

23. Notably, less than eight months before Maclin registered "Reach Back LLC," on December 7, 2018, according to the Wisconsin Department of Financial Institution's website, Maclin's suspected co-conspirator, William Newman, also registered an LLC, "Knough Bakery Company LLC." Newman listed his address, as registered-agent for that LLC, the same Pack N Ship CMRA located at 333 W. Brown Deer Road, Suite G, Milwaukee, Wisconsin, that Maclin had used as Maclin's registered-agent address for Reach Back LLC. Although Newman's LLC was not involved in the conduct at issue in this warrant, the proximity in time and common registered-agent mailing address that Maclin and Newman both used in forming their respective LLCs suggests that Newman and Maclin were associated with each other and shared information

5

about how to form LLCs. Those facts are relevant because they increase the likelihood that Maclin and Newman were in fact co-conspirators in the money laundering conspiracy whose existence, membership, and operation the United States intends to prove to a probable cause standard in this affidavit.

### Antoine Maclin's opening of BOA 1679 and USB 0119 in his and Reach Back LLC's names

24. On July 26, 2019, one day after having incorporated Reach Back LLC, Maclin opened account BOA 1679 at a Bank of America branch in McHenry, Illinois. According to Bank of America records, Maclin did so with a $100 deposit. Maclin listed himself and "Reach Back LLC" on the account.

25. Four days later, on July 30, 2019, according to U.S. Bank records, Maclin opened account USB 0119 at a U.S. Bank branch located at 10330 W. Silver Spring Dr., Milwaukee, WI 53225. Maclin did so with a with a $100 deposit. Maclin opened the account in his own name and in the name of "Reach Back LLC."

### Antoine Maclin's and William Newman's use of BOA 1679 to receive $99,694.58 in BEC fraud proceeds

26. Maclin appears to have opened BOA 1679 mainly, or solely, to receive BEC fraud proceeds. That is so because, according to Bank of America records, after BOA 1679 was opened, the account received only four deposits, consisting of four wire transfers totaling $99,694.58. Those $99,694.58 in deposits consisted entirely of BEC fraud proceeds.

27. On September 9, 2019, an unknown suspect or suspects caused a corporate BEC fraud victim having the initials U.L., LLC, based in Northbrook, Illinois, to wire, via two ACH transfers from its business account, a total of $30,696.25 into BOA 1679. The Bank of America Investigations unit advised TFO Brian Wallander that, according to a representative of victim UL, UL had intended to direct the ACH transfer of $30,000 to UL's legitimate vendor having the initial "E" and the ACH transfer of $696.25 to UL's legitimate vendor having the initials "RMR IK." But because of a BEC fraud scheme, UL was duped into wiring those $30,696.25 into the BOA 1679 account that Maclin had opened in the name of "Reach Back LLC." UL has no business relationship with Maclin, Newman, or Reach Back LLC.

28. On September 11, 2019, an unknown suspect or suspects caused a corporate BEC fraud victim having the initials C.C.C., based in Long Beach, California, to wire, via two ACH transfers from its business account, the sums of $60,053.33 and $8,945.00, respectively, into BOA 1679. D.E., the controller for BEC victim C.C.C., informed TFO Brian Wallander that C.C.C. was the victim of a BEC fraud scam. D.E. stated that an unknown suspect, posing as one of C.C.C.'s legitimate vendors, having the initials M-W, sent an email from an email account having an address very similar to vendor M-W's actual email address, to C.C.C. and requested a that C.C.C. make payments intended for vendor M-W to BOA 1679. C.C.C. has no business relationship Maclin, Newman, or Reach Back LLC. Thus, because of a BEC fraud scheme, BEC fraud victim C.C.C. was duped into wiring, via two ACH transfers, a total of $68,998.33 to BOA 1679.

29. As a result of these transactions, between September 9 and 11, 2019—less than two months after Maclin had opened BOA 1679—a total of $99,694.58 in BEC fraud proceeds was transferred into BOA 1679.

**Antoine Maclin's and William Newman's use of USB 0119 to receive $18,837.63 in BEC fraud proceeds**

30. Maclin appears to have opened USB 0119 solely to receive BEC fraud proceeds.

31. That is so because, according to U.S. Bank records, the *only* other deposit that appears to have been made into the account was a $18,837.63 wire transfer that consisted of BEC fraud proceeds.

32. Specifically, on September 10, 2019, an unknown suspect or suspects caused a corporate BEC fraud victim having the initials M.I., based in Houston, Texas, to wire, via ACH payment, $18,837.63 from one of M.I.'s business accounts into USB 0119. M.D., M.I's Security Operations Manager, stated to TFO Wallander that an unknown suspect, posing as one of M.I.'s legitimate trusted vendors having the initials D.T, sent an email message to M.I. that appeared to have originated from D.T. requesting that M.I. make future payments for D.T. to USB 0119. M.D. further indicated that BEC fraud victim M.I. had been duped into wiring the $18,837.63 to USB 0119 on false pretense that the account belonged to its vendor D.T. and while intending to make a payment to D.T. BEC fraud victim M.I. has no business relationship with Maclin, Newman, or Reach Back LLC.

**Antoine Maclin's and William Newman's laundering of BEC fraud proceeds that had been deposited into BOA 1679**

33. On September 12 and 13, 2019, within only two to four days after $99,694.58 in BEC fraud proceeds had been wire transferred into BOA 1679, Maclin and Newman withdrew the vast majority of those BEC fraud proceeds from BOA 1679 via various financial transactions. Those transactions, described below, appear to have been intended to launder the BEC fraud proceeds by concealing the nature, source, location, ownership, and control of those proceeds.

34. Those laundering transactions involving BEC fraud proceeds that had originally been deposited into BOA 1679 included:

- The September 12, 2019 purchase, using funds from BOA 1679, of Cashier's Checks 1 and 2, in the amounts of $27,000 and $6,700, respectively, which are the subjects of two of the five warrant applications;

- The September 12, 2019 purchase of a cashier's check in the amount of $45,000, which was then deposited only hours later into the account of a third party having the initials S.S., who appears to have acted as an unwitting money mule;

- The September 12, 2019 withdrawal of $12,000 in cash withdrawals from BOA 1679 at BOA branches in McHenry, Illinois, and Waukegan, Illinois, which

7
Case 2:19-mj-01355-WED   Filed 11/08/19   Page 8 of 18   Document 1

withdrawals I submit were the main source of the $12,282 seized from Newman at the time of his September 12 arrest, and which $12,282 in currency is also a subject of one of the five warrant applications.

35. Specifically, on September 12, 2019, at around 11:49 a.m., at a Bank of America branch located in McHenry, Illinois, Maclin and Newman purchased Cashier's Check 1 (number 1302104870) in the amount of $27,000 and another cashier's check in the amount of $45,000 (number 1302104869) using funds from BOA 1679. As an internal bookkeeping matter, Bank of America deposited the monies drawn on BOA 1679 into an internal Bank of America account ending 4142, and used those monies to fund Cashier's Checks 1 and 2. Maclin, Newman, or both also withdrew $7,000 from BOA 1679 at the Bank of America McHenry branch that day.

36. I know both that Maclin personally engaged in those September 12, 11:49 a.m. transactions at the BOA McHenry, Illinois branch, and that Newman was at least present during those transactions, based on still images I obtained from Bank of America. Two of those images are below. Image 1 below shows both Maclin and Newman at the BOA McHenry, Illinois branch on September 12, 2019, at or about 11:37 a.m.

**Image 1: Maclin and Newman at BOA McHenry Branch, September 12, 2019, 11:37 a.m.**



37. Image 2 below shows Maclin at the teller counter at the BOA McHenry, Illinois Branch on September 12, 2019, at or about 11:40 a.m., presumably in the course of purchasing Cashier's Check 1 for $27,000 as well as the $45,000 cashier's check, which bank records show he purchased at 11:49 a.m.

**Image 2: Maclin at BOA McHenry Branch, September 12, 2019, 11:40 a.m.**



09/12/2019 11:40:10.42
LT 2
Surveillance
MEHENRY-IL-112447

The images contained in this transmission were generated for the internal use of Bank of America and are being shared with law enforcement solely for use by law enforcement. Written consent must be obtained from Bank of America prior to sharing an image with a third party. Bank of America makes no representation or warranty of any kind with respect to any photograph, film, videotape or digital image and specifically disclaims liability to any person or entity for all damages, losses, claims, or expenses (including attorney's fees) arising from the furnishing or subsequent use, distribution or publication of any photograph, film, videotape or digital image provided to law enforcement by Bank of America. Any use or further distribution of this photograph, film, videotape or digital image by any party not employed directly by Bank of America is the sole responsibility of the user/distributor. Bank of America will only certify or attest to records or images provided under valid legal process.

38. I have identified Maclin as the person in both Images 1 and 2 by comparing his image in those photos with his photo on his Wisconsin driver's license, which I have obtained, and which I believe to depict the same person. I can identify Newman as the other person in Image 1 because I interviewed Newman in person in the course of his below-described arrest

9

later on September 12, 2019, and I believe that the other person in Image 1, besides Maclin, is Newman.

39. Just over an hour later, at approximately 1:05 p.m. on September 12, 2019, an unknown person or person—but very probably Newman or Newman and Maclin—caused the $45,000 cashier's check (number 1302104869) that Maclin had just bought at the BOA McHenry branch to be deposited into a Chase Bank account ending in 3173 held in the name of an individual having the initials S.S. at a Chase branch in Gray's Lake, Illinois. As described below, S.S. is believed to be the victim of romance and celebrity fraud. I know that Newman was involved in that transaction in some way because when Glendale (Wisconsin) Police Department arrested him later that same day, as described below, Newman had in his possession a customer copy of the September 12 purchase of the $45,000 cashier's check at BOA and a receipt for the deposit of that cashier's check into S.S.'s Chase Bank account.

40. Less than 30 minutes after the $45,000 BOA cashier's check had been deposited into S.S's Chase Bank account in Grayslake, Illinois, at or about 1:32 p.m., Maclin purchased Cashier's Check 2, a cashier's check in the amount of $6,700 (number 1663110728) at a Bank of America branch in Waukegan, Illinois. Image 3 below shows Maclin at the teller counter at the BOA Waukegan, Illinois, Fountain Square Branch on September 12, 2019, at or about 1:24 p.m., presumably in the course of purchasing Cashier's Check 2 for $6,700, which purchase was completed, according to bank records, at 1:32 p.m. Maclin also withdrew $5,000 from the Waukegan BOA branch that day.

**Image 3: Maclin at BOA Waukegan, Illinois branch, September 12, 2019, 1:24 p.m.**



The images contained in this transmission were generated for the internal use of Bank of America and are being shared with law enforcement solely for use by law enforcement. Written consent must be obtained from Bank of America prior to sharing an image with a third party. Bank of America makes no representation or warranty of any kind with respect to any photograph, film, videotape or digital image and specifically disclaims liability to any person or entity for all damages, losses, claims, or expenses (including attorney's fees) arising from the furnishing or subsequent use, distribution or publication of any photograph, film, videotape or digital image provided to law enforcement by Bank of America. Any use or further distribution of this photograph, film, videotape or digital image by any party not employed directly by Bank of America is the sole responsibility of the user/distributor. Bank of America will only certify or attest to records or images provided under valid legal process.

41. On September 13, 2019, an unknown suspect, probably Maclin, used $3,949 in funds from BOA 1679 to purchase cashier's check number 1663110734 was issued for $3,949.00 payable to William Newman. On September 16, 2019, Newman deposited check 1663110734 for $3,949 into his Guardian Credit Union account XXXX80. On September 24, 2019, $3,500 in cash was withdrawn from that Guardian Credit Union account.

### Antoine Maclin's and Williams Newman's laundering of BEC fraud proceeds that had been deposited into USB 0119

42. On September 12, 2019, only two days after $18,837.63 in BEC fraud proceeds had been wire transferred into USB 0119, Maclin and Newman caused $18,700 of those BEC fraud proceeds to be withdrawn from USB 0119 via financial transactions that were plainly intended to conceal and launder those proceeds.

43. Those laundering transactions included the purchase, using funds from USB 0119, of Cashier's Checks 3 and 4, defined below, which are the subjects of the two remaining warrant applications. Those laundering transactions also included $7,700 in cash withdrawals from USB 0119, which might also have been a source of the $12,282 in currency seized from Newman at the time of his September 12 arrest, which currency is also a subject of a warrant application.

44. On September 12, 2019, a $7,200 cash withdrawal was made from USB 0119 at 777 E. Wisconsin Ave., Milwaukee, Wisconsin, which is in the Eastern District of Wisconsin, and a $500 withdrawal was made from a USB ATM located in midtown Milwaukee.

45. On that same date, as U.S. Bank teller video confirms, Maclin used $11,000 in funds from USB 0119 to purchase Cashier's Check 3 (number 2072536345) and Cashier's Check 4 (number 2072536344), each in the amount of $5,500. As an internal bookkeeping matter, U.S. Bank deposited the monies drawn on USB 0119 into an internal U.S. Bank account ending 5230, and used those monies to fund Cashier's Checks 3 and 4.

### Statement of victim S.S. regarding related romance and celebrity fraud scheme

46. On September 23, 2019, TFO Brian Wallander and I met with a 68-year-old female having the initials S.S. regarding the $45,000 deposit that had been made into her Chase account ending 3173 from the Bank of America cashier's check number 130210489, which is not a subject of this seizure warrant application. As noted above, that $45,000 cashier's check had been purchased with funds transferred from BOA 1679 and the remitter on the check was Reach Back LLC.

47. S.S. believed that the $45,000 deposit had been made by Keith Urban, a popular country music singer. S.S. stated that an individual she believed to be Urban had begun corresponding with her via text messages approximately two years earlier after she had made posts on social media regarding Keith Urban.

48. S.S. stated that she had never met Keith Urban in person and only corresponded with him electronically.

49. From about August 2017 through September 2019, S.S. had deposited a total of approximately $32,000 of her own money into a Bitcoin ATM at the direction of the individual she believed to be Keith Urban. S.S. was under the belief that she was putting money into a shared account with Keith Urban and that he was going to assist her with purchasing a house in the future.

50. S.S. withdrew the $45,000 that had been deposited into her Chase Bank account ending in 3173 and deposited the $45,000 in funds into a Bitcoin ATM at the direction of the individual she believed to be Keith Urban. As noted, this $45,000 is traceable to BEC proceeds that had originally been deposited into BOA 1679 and were then used to buy Cashier's Check 330210489, and then deposited into S.S.'s Chase Bank account ending in 3173.

51. S.S. stated that she does not know William Newman, Antoine Maclin, or Reach Back LLC.

52. S.S. stated that she had deposited $32,000 of her own money, plus the $45,000 that had been deposited into her Chase account ending in 3173, into a Bitcoin ATM, on the instructions of the person she believed to be Keith Urban.

53. I submit that at least Newman was involved in causing S.S. to apparently unwittingly help launder the BEC fraud proceeds in this case because, as noted below, following Newman's September 12, 2019 arrest, Glendale PD turned over the 2017 black Volvo S90, which Newman was driving when he was arrested, to the custody of the Wauwatosa Police Department. On September 13, 2019, in the course of conducting an inventory search of Newman's Volvo for Wauwatosa PD, I found in that vehicle both (a) a customer copy of the September 12 purchase of the $45,000 cashier's check at BOA and (b) a receipt for the deposit of that cashier's check into S.S.'s account at Chase Bank. I then seized those items as evidence.

**William Newman's September 12, 2019 arrest for loan fraud and seizure, initially as evidence, of cashier's checks and currency now sought to be seized for forfeiture purposes**

54. On March 5, 2018, William Newman completed a membership application with Focus Credit Union, 3180 N. 124th St., Wauwatosa, Wisconsin, which is in the Eastern District of Wisconsin. Newman provided his Social Security number as 393-99-8XXX.

55. On March 12, 2018, Newman applied for and obtained a loan for $51,866.50 from Focus Credit Union for a 2017 black Volvo S90 (VIN YV1A22ML1H1001446) (the "Volvo") purchased from Patrick Cars in Illinois. Newman again provided his Social Security number as 393-99-8XXX on the loan documents.

56. I later learned that Newman's true Social Security number is 396-98-1XXX, and that he used a Credit Privacy Number ("CPN") when he signed the membership and loan applications.

57. A CPN is a nine digit number that initially does not have a credit profile associated with it. It could be a future Social Security number that has not yet been assigned to someone, or it could belong to a child or deceased person. Individuals will use the CPN to start opening small lines of credit in order to build a credit profile associated with the CPN. Once their credit score is high enough, they will typically obtain credit cards with a high credit limit or large loans, with no intent of ever paying them back.

58. K.Y. from Focus Credit Union provided me with records regarding Newman's membership and loan applications. Newman defaulted on the loan for the Volvo, resulting in a loss to Focus Credit Union.

59. Due to the loan and vehicle purchase being facilitated through a fraud scheme, the Volvo was entered into NCIC as stolen.

60. On September 12, 2019, officers with the Glendale Police Department conducted a traffic stop on the Volvo in the 1000 block of W. Silver Spring Drive in Glendale, Wisconsin. William Newman was the driver of the Volvo and was arrested. Newman and the Volvo were turned over to the Wauwatosa Police Department.

61. State of Wisconsin DOT records list William Newman's address as 5XXX N. Shasta Drive, Glendale, Wisconsin 53209, which is in the Eastern District of Wisconsin.

62. I recovered the property to be seized – the four cashier's checks and the $12,282 in currency described in paragraph 5 – from Newman and the Volvo. Those property items were then placed in Wauwatosa Police Department inventory as evidence.

63. Newman is a realtor and stated that he owns Coterie Realty Group. While in police custody, Newman claimed that Cashier's Checks 1, 2, 3, and 4 were from out-of-state investors for the purposes of real estate closings that he had in the coming week. I have determined that this claim was false and that the checks and cash were proceeds of the above-described BEC fraud scheme.

64. Newman had those four cashier's checks and the $12,282 in currency sought to be seized when he was arrested on the evening of September 12, 2019. Newman also had the receipt for the $45,000 BOA cashier's check (number 13020104869) that Maclin had purchased that day—in Newman's presence—at the BOA McHenry branch that day. Newman also had the deposit slip showing that that BOA $45,000 cashier's check had been deposited into S.S.'s Chase account. As S.S. noted, she then deposited that $45,000 into a bitcoin ATM as part of the romance fraud and imposter fraud part of this apparent money laundering conspiracy.

65. Newman was released from custody on September 13, 2019, pending further investigation.

66. At approximately 11:42 a.m. on September 18, 2019, Newman called me from 414-630-7XXX. The caller ID on my phone showed the call coming from Antoine Maclin, which is further evidence of their close association.

## Applicable Money Laundering and Asset Forfeiture Provisions

67. Under 18 U.S.C. § 984, a court may order the forfeiture of funds in a bank account into which monies subject to forfeiture have been deposited, without the need to trace the funds currently in the account to the specific deposits that are subject to forfeiture, up to the amount of the funds subject to forfeiture that have been deposited into the account within the past one-year period.

68. Section 984 (a) provides in part:

(1) In any forfeiture action in rem in which the subject property is cash [or] funds deposited in an account in a financial institution

   (A) it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and

   (B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

(2) Except as provided in subsection (c), any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section.

69. 18 U.S.C. § 984(b) provides: "No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense."

70. Thus, under Section 984, a court may order the civil forfeiture of monies found in a bank account into which deposits of criminal proceeds subject to forfeiture had been made, up to the amount of the forfeitable deposits that have been made into the account within the prior one-year period, without the need for tracing the funds to be forfeited to any of the specific forfeitable deposits.

## Conclusion

71. Cashier's Checks 1, 2, 3, and 4, as well as the $12,282 currency, are currently being held as evidence at the Wauwatosa Police Department.

72. According to Bank of America and U.S. Bank, as of October 21, 2019, none of the four cashier's checks that are the subjects of these warrant applications have been negotiated.

73. I submit that there exists probable cause to believe that up to $56,982 in proceeds of a wire fraud scheme – which involved material misrepresentations and the use of interstate wires in connection with a BEC fraud scheme were deposited into BOA 1679 and USB 0119, and that those proceeds were then used to purchase Cashier's Check 1, Cashier's Check 2, Cashier's Check 3, and Cashier's Check 4.

74. I submit that there exists probable cause to believe that the $12,282 in currency seized from Newman at the time of his September 12, 2019 arrest also represented proceeds traceable to the BEC fraud scheme. That is because, on that same date, Maclin withdrew $12,000 in BEC fraud proceeds from BOA 1679 and Maclin or someone having access to his account, withdrew another $7,700 in currency traceable to BEC fraud proceeds from USB 0119. Notably, Maclin withdrew $7,000 from BOA 1679 from the McHenry, Illinois BOA branch, where video images show Newman was also present. It is therefore probable that the $12,282 found on Newman's person later that day was traceable to these $19,700 in total BEC fraud proceeds that Newman's associate Maclin had withdrawn earlier that day from the two accounts that he received the fraud proceeds—BOA 1679 and USB 0119.

75. I further submit that there exists probable cause that the four cashier's checks and $12,282 in seized currency represent funds involved in money laundering. That is because Maclin's purchase, apparently in conspiracy with Newman, of the four cashier's checks, using BEC fraud scheme proceeds, while both knew that the money involved in the purchase of those cashier's checks involved proceeds of some form of criminal activity, strongly appears to be have been intended to conceal the nature, source, location, ownership, and control of those proceeds by concealing the whereabouts of those funds. Maclin's withdrawal of $19,700 of those fraud proceeds as cash is further evidence of such intent to conceal. And the transfer of $45,000 of the BEC fraud proceeds to a Chase Bank account of apparent romance fraud victim S.S. and the immediate withdrawal of those proceeds to buy Bitcoin, apparently with Newman's involvement, is further evidence of Maclin's and Newman's shared intent to engage in concealment money laundering, in violation of 18 U.S.C. § 1956(h).

76. I further submit that a restraining order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the funds for forfeiture because I have been advised of cases in which, even after restraining order or similar process has been issued to financial institution to restrain the cashing of a cashier's check, the funds sought to be restrained were not effectively restrained by the financial institution in that the financial institution cashed the cashier's check despite the existence of the restraining order. In my judgment, a seizure warrant would be the most effective way to assure the availability of the money sought to be seized for forfeiture.

77. I therefore submit that there exists probable cause to believe that a total of $56,982 – namely, the bank funds funding the $27,000 value of Cashier's Check 1, the $6,700 value of Cashier's Check 2, the $5,500 value of Cashier's Check 3, the $5,500 value of Cashier's Check 4, and the $12,282 in seized United States currency – consists of proceeds of a BEC fraud scheme and funds involved in money laundering and are therefore subject to seizure and forfeiture under both the civil and criminal asset forfeiture statutes as:

   a. Funds traceable to, and therefore proceeds of, a wire fraud offense or offenses committed in violation of 18 U.S.C. § 1343;

   b. Funds involved in concealment money laundering committed in violation of 18 U.S.C. § 1956;

c. Subject to civil forfeiture under 18 U.S.C. §§ 981(a)(1)(A) and (C) and 984, including cross-references in § 981(a)(1)(C) to 18 U.S.C. §§ 1956(c)(7) and 1961(1);

d. Subject to criminal forfeiture under 18 U.S.C. §§ 982(a)(1) and 981(a)(1)(C) and 28 U.S.C. § 2461(c); and

e. Subject to seizure via a civil seizure warrant under 18 U.S.C. § 981(b)(2) and via a criminal seizure warrant under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(f).

# # #

# EXHIBIT 1

**CCC**

Business Email Compromise 09/11/19 Intended for vendor M▮▮▮▮▮ ACH payment of $60,053.33 into Reach Back LLC and second payment on 09/13/19 of $8,945. Total loss $68,998.33

**UL**

Business Email Compromise 09/09/19 Intended for vendor E▮▮▮▮ ACH payment of $30,000 and second ACH of $696.25 intended for vendor R▮▮▮ into Reach Back LLC Total Loss $30696.25

**MI**

Business Email Compromise Intended for vendor E▮▮▮▮ ACH payment of $18,837.63 made on 09/10/19 into Reach Back LLC

$500 ATM Withdrawal 09/12/19 US Bank Branch 2110 Midtown

$7,200 Cash withdrawal 09/12/19 US bank branch 2072 Center

**US Bank Reach Back LLC**
Antoine Maclin Acct 1▮▮237890119

US Bank Cashiers Check 2072536344 purchased 09/12 at branch "2072 Center" $5,500 payable to A▮▮▮ L▮▮

US Bank Cashiers Check 2072536345 purchased 09/12 at branch "2072 Center" $5,500 payable to L▮▮ E▮▮

Cashiers check deposited on 09/16/19 at Guardian CU ATM Menomonee Falls, WI

**GUARDIAN CREDIT UNION**
William Newman Account 162180

$3,500 Cash Withdrawal on 09/24/19 Guardian CU

Bank of America Cashiers Check 1663110734 purchased 09/13/19 in McHenry, IL at 5:36pm $3,949 payable to William Newman

Bank of America Cashiers Check 1302104870 purchased 09/12/19 in McHenry, IL at 11:49 am $27,000 payable to K▮▮ ▮▮

Bank of America Cashiers Check 1663110728 purchased in Waukegan Fountain Square branch 09/12/19 at 1:32pm for $6,700 payable to William S. Newman

$99,694.58 total deposited in BEC proceeds

**Bank of America Reach Back LLC**
Antoine Maclin Acct 898108341679

$7,000 Cash withdrawal 09/12/19 Bank of America McHenry, IL

$5,000 Cash withdrawal 09/12/19 Bank of America Waukegan, IL

$12,282 cash on Newman at time of his arrest on 9/12/19

Receipt for deposit and customer copy of Cashier's Check in Newman's Possession

Bank of America Cashiers Check 1302010486▮ purchased 9/12/19 in M▮▮▮▮ IL at 11:46am $5,000 payable to S▮▮ S▮▮

Cashiers check deposited on 09/12/19 13:05 hours at Grayslake, IL Chase branch 000609

**CHASE**
S▮▮ S▮▮
South Bend, IN Chase Bank Account ending 3173

**William S Newman**
DOB 05/06/1982

Bank Of America account 1679 took in $99,694.58 in BEC funds.
Known traced funds back to NEWMAN / MACLIN is $94,649.00

US Bank account 0119 took in $18,837.63 in BEC funds.
Known traced funds back to NEWMAN / MACLIN is $18,700.00

* Red Font and Boxes are subject of the seizure warrant